UNITED STATES of America

v.

GULF OIL CORPORATION et al.

Crim. A. No. 75–231.

United States District Court,
W. D. Pennsylvania.

Dec. 29, 1975.

Craig McKay, Asst. U. S. Atty., Pittsburgh, Pa., Stuart Bluestone, Federal Energy Administration, Washington, D. C., for plaintiff.

Frank L. Seamans, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., Leo T. Kissam, Kissam & Halpin, New York City, for defendants.

## OPINION AND ORDER

SNYDER, District Judge.

### I. THE MOTION TO DISMISS.

This Indictment seeks to impose a criminal fine upon Gulf Oil Corporation, Gulf Oil Company-U.S., and Gulf's President, Z. D. Bonner, based upon the failure of Gulf for the first five days of February, 1975, to pay its competitors $3,878,465.00 for "Entitlements" under the Federal Energy Administration Program (FEA) established in the Federal Register on December 4, 1974 (39 Fed. Reg. 42246–50). This program, unlike the typical allocation regulation, required the transfer of money among refiners to equalize the impact of the high cost of foreign produced oil.[1]

The Defendants point to the language of Federal Rules 12(b)(1) and (4) of Criminal Procedure,[2] which provide:

"(1) *Defenses and Objections Which May Be Raised.* Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion."

\* \* \* \* \* \*

"(4) *Hearing On Motion.* A motion before trial raising defenses or objections shall be determined before trial unless the court orders that it be deferred for determination at the trial of the general issue. An issue of fact shall be tried by a jury if a jury trial is required under the Constitution or an act of Congress. All other issues of fact shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct."

The Defendants then urge that the Court dismiss the Indictment for the following reasons:

"(1) Fundamental principles of due process of law and equal protection preclude the Government from criminally prosecuting defendants as a result of their decision to delay Gulf's compliance with the FEA's entitlements program pending a judicial determination sought by Gulf of the validity of the very FEA regulations un-

---

1. An explanation of the Entitlements Program is found in this Court's analysis of the Civil Action brought by Gulf to test its Constitutionality, *Gulf Oil Corporation v. Federal Energy Administration*, decided February 26, 1975, and reported at 391 F.Supp. 856.

2. The Motion was argued prior to the effective date of the Amendments to the Federal Rules of Criminal Procedure.

der which the Government now seeks to impose criminal sanctions;

(2) Throughout the February 1–5, 1975 period enforcement of the FEA entitlement regulations which defendants are accused of willfully violating had been stayed by the Temporary Emergency Court of Appeals ('TECA');

(3) The Government is estopped from seeking to impose criminal sanctions for the alleged violations of the FEA entitlement regulations due to representations made to defendants prior to and during the February 1–5, 1975 period that the FEA would refrain from initiating legal proceedings based upon a failure of Gulf to purchase entitlements if Gulf promptly initiated judicial proceedings to test the validity of said regulations;

(4) As a matter of law the Government is precluded from seeking to impose criminal sanctions for the alleged violations of the FEA entitlement regulations since defendants' decision to suspend the purchase of entitlement payments was also made upon reliance on the advice of its counsel;

(5) Gulf was not required under the FEA entitlement regulations to purchase entitlements during the February 1–5 period since January 31, 1975 was merely the date for voluntary compliance;

(6) The Government has already sought to impose civil penalties upon Gulf with regard to its decision not to purchase entitlements during the February 1–5, 1975 period in the action currently pending before this Court at Civil Action No. 75–157 and thus the Government's seeking to impose criminal penalties with regard to the same acts in this action is without statutory

authority under the EPAA and constitutes an attempt to increase unlawfully the maximum statutory penalty per violation from $5,000 to $7,500 also placing defendants in double jeopardy.

(7) The FEA entitlement regulations upon which the Indictments are based are illegal, unauthorized, arbitrary, capricious, confiscatory and contrary to both the EPAA and the Fifth Amendment to the Constitution of the United States; and

(8) The Indictment against Gulf Oil Company-U.S. is null and void since that defendant is a division of Gulf and, accordingly, not capable of an independent violation of the FEA entitlement regulations." [3]

Defendant Bonner also moves to dismiss on the basis that he is not a "person" who can be charged with the offense defined in the statute. In opposition, the Government filed a Motion to Strike; in the Alternative to Defer Argument and Ruling until Trial of the General Issue.

The problem of the extent of the subject matter which may be considered by a court prior to a criminal trial is not without difficulty. In *United States v. Covington*, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969), the Supreme Court considered whether, in an indictment charging the defendant with obtaining marihuana without having paid the transfer tax,[4] a court can entertain a motion to dismiss the indictment on the ground that the defendant's privilege against self-incrimination would necessarily provide a complete defense. The Court initially noted (395 U.S. at p. 60, 89 S.Ct. at p. 1561, 23 L.Ed.2d at p. 99):

"Federal Rule of Criminal Procedure 12(b)(1) states that: 'Any defense or

---

**3.** Defendants also allege that this Indictment was brought in bad faith to stifle Gulf's opposition to, and efforts to voice such opposition to, the Entitlements Program in the Courts, Congress and the media. Upon motion by the Defendants, this Court on October 1, 1975, deferred consideration of the contention.

**4.** 26 U.S.C. § 4741(a) [Repealed, Pub.L. 91–513, 84 Stat. 1292 (1970)] provided: "(a)

*Rate.*—There shall be imposed upon all transfers of marihuana which are required by section 4742 to be carried out in pursuance of written order forms taxes at the following rates: . . . .."

Failure to comply with the above stated provision was made unlawful by 26 U.S.C. § 4744(a), also repealed.

objection which is capable of determination without the trial of the general issue may be raised before trial by motion.' *A defense is thus 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.* Rule 12(b)(4) allows the District Court in its discretion to postpone determination of the motion to trial, and *permits factual hearing prior to trial if necessary to resolve issues of fact peculiar to the motion.*" [Emphasis supplied] [Footnote omitted]

The Court noted that compliance with 26 U.S.C. § 4741(a) would unquestionably run a substantial risk of incrimination, and thus affirmed the lower court's dismissal of the indictment. Here, the defenses raised require the consideration of facts presented in affidavit form, and we must determine if the trial of the general issue would resolve the issues peculiar to the Motion.

Several cases have considered the propriety of a Rule 12(b) Motion grounded in the defense of double jeopardy. Judge Will in *United States v. American Honda Motor Company,* 273 F.Supp. 810 (N.D.Ill.1967), an anti-trust case, stated (at pp. 814–815):

"Rule 12(b) provides that any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion and, further, that issues of fact on such motions shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct unless jury trial is required under the Constitution or by any Act of Congress.

In *United States v. H. E. Koontz Creamery, Inc.,* 232 F.Supp. 312 (D.Md. 1964), the court, citing Rule 12(b), carefully reviewed the procedure concerning a pre-trial double jeopardy motion like the one here involved. Rejecting a government contention that the double jeopardy issue (unless determinable as a matter of law), must

be submitted to the jury along with the general issue, the court ordered a pre-trial evidentiary hearing without a jury . . . . .

This court is of the opinion that such procedure is proper . . . . ."

Special pleas in bar (and their modern counterparts, Rule 12(b) Motions) based upon the defense of the statute of limitations have been brought with varying results. In the early case of *United States v. Barber,* 219 U.S. 72, 31 S.Ct. 209, 55 L.Ed. 99 (1911), the Supreme Court noted with approval a statement of government counsel (219 U.S. at p. 78, 31 S.Ct. at p. 211, 55 L.Ed. at p. 101):

" ' . . . the plea of the statute of limitation does not question the validity of the indictment, but is directed to the merits of the case; . . . .' "

*See also, United States v. Cook,* 84 U.S. (17 Wall.) 168, 21 L.Ed. 538 (1872), where it was held that the statute of limitations could not be raised by demurrer but could be by special plea. Yet, the *Barber* Court recognized that where the indictment charged a continuing conspiracy expressly alleged to have continued until trial, the statute could only be put in issue by a plea of the general issue, citing *United States v. Kissel,* 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910).

However, in *United States v. J. R. Watkins Company,* 16 F.R.D. 229 (D.Minn.1954), a prosecution for knowingly and falsely representing that alcohol used in the manufacture of linament for internal uses had been used in the manufacture of linament for external use only, the Court determined that it could consider the defense under a Rule 12(b) Motion, stating (at pp. 232–233):

"It seems apparent that in the case at bar the defense based upon the statute of limitations is capable of determination without the trial of the general issue and therefore should, under Rule 12(b)(1), be triable upon this motion. Further, it seems to have been the intention of the committee which drafted the rules that the statute of limitations could be raised at

the option of the accused either before or at the trial of the general issue. See 18 U.S.C.A. Rule 12, Notes to Subdivision (b)(1) and (2). And see Official Form No. 19, Appendix of Forms, 18 U.S.C.A. which includes as part of the motion to dismiss the indictment the allegation that it was not found within three years next after the alleged offense was committed. The same has been the understanding of commentators on the rule, although none cite cases for their conclusion. See 11 Cyclopedia of Federal Procedure § 42.170 (Smith, ed., 1952); McInerny, Proceedings Between Indictment and Trial, 5 F.R.D. 156, 159.

Although consideration of the bar of the statute in the instant case requires an examination of various reports made by the defendant to the Alcohol Tax Unit, among them the allegedly false report upon which this indictment is based, the Court concludes that such an examination is proper. Rule 47 allows facts such as authority to take a deposition or former jeopardy to be established by affidavit, see Note to Rule 47, 18 U.S.C.A, and Rule 12(b)(4) provides that issues of fact not required to be tried by a jury may be tried in any manner the court may direct. It would be injudicious to ignore the information obtainable from the face of the reports in issue when determining whether the one upon which the indictment was based was or was not barred by lapse of time. *Such an examination would not seek to contradict the well-pleaded material allegations of the complaint, for defendants do not dispute that the report relied upon by the Government was returned on or about October, 15, 1950, but seek to explain why the said report cannot be the basis for this prosecution.* The Government's contention that the trial of this issue requires evidence which could not, or should not, be presented at a preliminary hearing is somewhat abstruse. If the Government has any evidence contradictory of that presented in the four corners of the reports in question, it would merely have to produce affidavits from a qualified witness to that effect. This Court would be required to defer decision on the motion if any genuine issue of material fact were presented. The Government's right to cross-examine, however, does not in itself raise such an issue, and in the absence thereof, the sufficiency of the defense on the statute of limitations may be decided upon the arguments and exhibits presented." [Emphasis supplied] [Footnote omitted]

In *United States v. Haramic,* 125 F.Supp. 128 (W.D.Pa.1954), Judge Marsh of this Court, as did the Court in *Watkins,* traced the history of the defense of statute of limitations upon a Motion under Rule 12(b), concluding (at p. 129):

"As provided in Rule 12(b)(4), we think it is in the discretion of the court whether the defense of the statute of limitations should be determined before the trial or at the trial of the general issue. Protection from prosecution under a statute of limitations is a substantive right. In the circumstances presented by this case, it may very well appear preliminarily that the defendant cannot be convicted because of the bar of the statute of limitations. If that is so, he should not be compelled to stand trial. 'If no other reason existed, the uselessness of the trial would be a sufficient one for dispensing with it.' *Cf. United States ex rel. Hassell v. Mathues,* D.C.E.D.Pa. 1928, 27 F.2d 137."[5]

So too, in *United States v. Dierker,* 164 F.Supp. 304 (W.D.Pa.1958), Judge Marsh noted that as a general rule the bar of the statute of limitations is a matter to be determined at the trial of the general issue; but when the motion to dismiss pleads facts capable of determination prior to trial, a preliminary hearing may be held. In *Dierker,* the defendant was

5.  *See also, United States v. Auto Rental Company,* 187 F.Supp. 603 (W.D.Pa.1960).

alleged to have aided and abetted one Stirone in an extortion scheme, in violation of the Hobbs Anti-Racketeering Act, 18 U.S.C. § 1951. The dates charged in the information were from on or about September 1, 1951 to on or about December 31, 1953. The Rule 12(b) Motion alleged *inter alia,* that the information was not found within five years from December 18, 1952. Judge Marsh stated (at pp. 305–306):

"The defendant does not plead facts to show that no money was paid by Rider [the victim] to Stirone since December 19, 1952. In federal courts the bar of the statute of limitations is a matter of defense usually to be determined at the trial of the general issue. Of course, when the motion to dismiss (formerly a special plea in bar) pleads facts which are capable of determination before the trial of the general issue, a preliminary hearing may be held. Rule 12(b)(1, 4), Fed.R.Crim.P. Even though it appears on the face of an information that the period of limitations has expired or, as here, may have expired, it should not be dismissed on a *nonfactual* motion." [Emphasis supplied] [Citations omitted]

Finally, in *United States v. Andreas,* 374 F.Supp. 402 (D.Minn.1974), the Court, citing *Jaben v. United States,* 333 F.2d 535, 538 (8th Cir. 1964), *aff'd* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345, *reh. denied* 382 U.S. 873, 86 S.Ct. 19, 15 L.Ed.2d 114 (1965), noted that the defense of statute of limitations was properly before the Court on a motion to dismiss the information, but that defendants' method of raising the defense, namely, by seeking through affidavit to contradict the allegations of the information, was impermissible. It stated that the question of when the transaction (illegal political contributions) occurred was closely intertwined with the questions of if and how the contributions occurred:

" . . . The fact of such contributions, as well as the circumstances and time of said contributions, are all factors which present genuine issues of

material facts and are necessarily left to a trial of the general issue—they go to the very foundation of the prosecution. *Accord, United States v. J. R. Watkins Co.,* 16 F.R.D. 229, 234–235 (D.Minn.1954)." 374 F.Supp. at p. 408.

The defense of entrapment was not permitted to be raised by way of pretrial motion in *United States v. Leighton,* 265 F.Supp. 27 (S.D.N.Y.1967), *cert. denied* 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968). The Court without extensive discussion denied such attempt, stating simply (at p. 36):

"The defense of entrapment is an issue for the jury where an issue of fact is presented. [Citations omitted]; I cannot see how such a defense can be the proper subject of a pre-trial hearing especially since the defendant, even if he were to establish entrapment as a matter of law, would be adequately protected against an adverse jury verdict by the trial court's ability to enter a directed verdict of acquittal. . . . "

Cases involving refusal to report for induction have had to consider the propriety of Rule 12(b) motions asking the Court to consider matters outside the bare allegations of the indictment. In *United States v. Seeley,* 301 F.Supp. 811 (D.R.I.1969), the Court was asked to consider on a motion to dismiss the indictment, defense attacks on the Selective Service System's compliance with the statute and regulations. The following excerpt is most illustrative (at pp. 812–813):

"The problem which has most perplexed the Court is the threshold one of whether, in a selective service prosecution for failure to report for induction in which the defense attacks the System's compliance with the statute or regulations, a motion to dismiss the indictment and a hearing thereon is an appropriate procedure. I am frank to acknowledge that I have been unable to discover any case which has dealt with this problem. I am likewise frank to acknowledge that the procedures which appear to have been most

frequently and regularly used by the federal trial courts in this type of a case are either to admit before the jury all of the facts concerning the defendant's classification processing and then to rule on a motion for judgment of acquittal as to the correctness of the processing, *see, e. g. United States v. Blaisdell,* 294 F.Supp. 1303 (D.Me.1968), or to try the case to a judge without jury and to stipulate the entire classification matter to the Court to rule as a matter of law, *e. g., United States v. Bryan,* 263 F.Supp. 895 (N.D.Ga.1967). In the instant case the latter method is impossible because this is a jury trial. I am troubled by the former method. It seems to me to be a sham if all of the classification processing matters relevant to the particular defendant's claim of classification defect are given to the jury, even though it is not matter upon which they are permitted to decide guilt or innocence and which they ought not therefore to be permitted to consider, and is then upon motion for judgment of acquittal determined by the Court. It troubles my sense of orderly procedure to submit to a jury matter not proper for its deliberations so that the judge, for whom the matter is proper, can hear it and rule on it. Moreover, such a procedure may, in those cases in which the classification defect claim is the only realistic defense, cause waste by forcing a lengthy trial proceeding when a preliminary hearing by the judge would suffice. Finally, such a procedure invites confusion for the jury in those cases in which the Court, having decided as a matter of law that the alleged classification defect is not a sufficient defense to warrant acquittal, must then attempt by instructions to purge the jury of all that they have heard concerning the alleged classification defect which, while not compelling as a matter of law, may be exceedingly compelling as an emotional matter.

The prosecution argues in its brief that because the motion to dismiss here does not attack the sufficiency of the indictment on its face, it is incorrect as a matter of procedural law. With that I must disagree. While it is true that a motion to dismiss an indictment most often goes to the facial sufficiency of the indictment, that is not its exclusive function. For example, a Rule 12(b)(2) motion may be used to attack a 'defect in the institution of the prosecution' such as illegal grand jury selection procedures, or irregular grand jury practice. *See* Committee Note to Fed.R.Crim.P. 12. Likewise, a Rule 12(b)(1) motion may be used to attack on any basis 'capable of determination without a trial of the general issue,' such as, former jeopardy, former conviction, immunity, or statute of limitations. *See* Committee Note to Fed.R.Crim.P. 12. While I am not prepared to state that a defect in Selective Service classification processes is a 'defect in the institution of the (50 U.S.C.App. Sec. 462(a)) prosecution,' I do think that the breadth of Rule 12(b)(1) permits a motion to dismiss a 50 U.S.C.App. Sec. 462(a) indictment to be made, as a procedural matter, to the Court when the defendant is attacking the classification process. Such a ruling is in my view a time-saving and fair procedure which admirably comports with the function of the courts in reviewing Selective Service System decision-making. *See Estep v. United States,* 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), *Cox v. United States,* 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1948). . . ."[6]

In a second case, *United States v. Shelly,* 330 F.Supp. 1214 (E.D.Pa.1971), Judge Body considered the *Seeley* opinion, concluded that it lost much of its force after the First Circuit's opinion in *United States v. Ramos,* 413 F.2d 743 (1969), which noted that the validity of a defendant's classification is a matter to

---

**6.** *Accord: United States v. Ward,* 366 F.Supp. 347 (D.Haw.1973).

be raised at trial and not by a motion to dismiss, and held that since the indictment met the three-fold test of *United States v. Fargas,* 267 F.Supp. 452 (S.D.N.Y.1967),[7] the motion to dismiss based on the validity of an induction order would be denied.

Finally, in *United States v. Martinez,* 350 F.Supp. 971 (W.D.Pa.1972), Judge McCune of this Court determined that he could consider defendant's Selective Service file and Pennsylvania State Court records in evaluating a Rule 12(b)(1) motion to dismiss the indictment. Judge McCune sided with the *Seeley* Court, holding (at p. 973):

"In connection with this motion defendant contends that we may properly under Rule 12(b)(1) consider defendant's Selective Service file and certain Pennsylvania State court records. The government argues that on a motion to dismiss the court may not look beyond the face of the indictment, citing *Las Vegas Merchant Plumbers Ass'n. v. United States,* 210 F.2d 732 (9th Cir. 1954) *cert. denied,* 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954), *rehearing denied,* 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 698 (1954).

Cases come down on both sides of this question, but few have confronted the issue directly. This question has been present before the Supreme Court but was not resolved, *United States v. Weller,* 401 U.S. 254, 91 S.Ct. 602, 28 L.Ed.2d 26 (1971). The district court decisions in *United States v. Seeley,* 301 F.Supp. 811 (D.R.I.1969) and *United States v. Shelly,* 330 F.Supp. 1214 (E.D.Pa.1971), carefully consider the scope of Rule 12(b)(1) and reach the opposite conclusion. The *Seeley* decision was based on a pragmatic concern for the expenditure of judicial time. *Shelly* on the other hand was decided on the basis of previous decisions in that district.

The U.S. Attorney argues that allowing the defendant to present defenses by motion will permit piecemeal presentation by the defense. Then in the event of a loss, the defense could be relitigated at trial. There is also expressed a concern that such determinations before trial will constitute jeopardy. We fail to perceive the significance of the latter concern. If a matter of defense, requiring determination by the court rather than the jury, is decided in defendant's favor whether that decision is made during or before trial, we do not doubt that jeopardy attaches, *United States v. Ponto,* 454 F.2d 657 (7th Cir. 1971); *United States v. Findley,* 439 F.2d 970 at 973–974 (1st Cir. 1971). In either event the government would not have a right of appeal under 18 U.S.C.A. § 3731. If a defense exists which does not require a jury determination we believe it proper to present such a defense by way of a motion under Rule 12(b)(1). We believe this view is supported by the language of the Rule, and most authorities; *United States v. Covington,* 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969); *United States v. Weller,* 401 U.S. 254, 91 S.Ct. 602, 28 L.Ed.2d 26 (1971); *United States v. Ponto,* 454 F.2d 657 (7th Cir. 1971); *United States v. Findley,* 439 F.2d 970 (1st Cir. 1971); 8 J. Moore Fed. Practice, ¶ 12.04 at 12–15 (2d ed. 1970). The contrary view expressed in *United States v. Ramos,* 413 F.2d 743–744, n. 1 (1st Cir. 1969), is by way of dicta. In *Seeley* alone do we find an unequivocal rejection of defendant's position. In the face of the above cited authorities we decline to follow the *Seeley* decision."[8]

---

7. The test of *Fargas* is as follows (267 F.Supp. at p. 454):

"This indictment is amply sufficient to inform the defendant of the nature of the charge against which he must defend himself; to protect him against double jeopardy; and to enable the court to determine whether the facts alleged are sufficient in law to withstand a motion to dismiss or to support a conviction. . . . "

8. The Court in the last two sentences of the above-quoted portion of *Martinez* referred to *Seeley* when it clearly meant to refer to *Shelly.*

Yet another line of cases especially illuminating involve prosecutions arising under the Federal obscenity laws. In *United States v. Head,* 317 F.Supp. 1138 (E.D.La.1970), a motion to dismiss was filed alleging that the statute was unconstitutionally applied to the defendants. The Court determined that it and not a jury would decide whether the material was obscene (at pp. 1140–1141):

> " . . . When a defendant is charged with violating a criminal obscenity law the threshold constitutional question resembles the ultimate factual question: is this material obscene? The judge has a duty to protect the constitutional rights of defendants who assert the protection of the First Amendment that requires him, when the issue is properly presented, to pass on the constitutional adequacy of the evidence before it can be submitted to the jury on the question whether the statute was violated. His decision is a constitutional one.
>
> Once the judge has determined that the First Amendment does not protect the material involved, the 'general issue' that the jury must decide is whether the publications were 'unmailable' under the statute. It can decide only the statutory question. The term 'general issue,' as used in Rule 12, necessarily refers to those questions of fact that a jury is constitutionally permitted to decide, those inferences and conclusions that the constitution permits them to draw from evidence that the constitution permits them to consider."

However, in the case of *United States v. Ginzburg,* 338 F.2d 12 (3d Cir. 1964), aff'd 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31, *reh. denied* 384 U.S. 934, 86 S.Ct. 1440, 16 L.Ed.2d 536 (1966), our Circuit Court of Appeals specifically upheld the District Court's actions in striking affidavits and exhibits in support of a motion to dismiss an indictment, stating (at p. 17):

> "Finally, appellants urge that the court erred in striking the affidavit and exhibits in support of the defense motion to dismiss the indictment. The defense on that motion was correctly limited by the court to the face of the indictment and whether it accurately charged the named offenses and gave adequate notification thereof to the defendants. The defense attempted by the affidavit and letters to put before the court in ex parte form, opinions from various sources favorable to the 'Handbook. These were trial matters and so held by the judge."

The foregoing examination shows that on a motion to dismiss an indictment, the allegations of the Rule 12(b) motion must require the Court to direct acquittal and must not attempt to contradict the material allegations of the indictment. This, the Court believes, is the holding of *United States v. Covington, supra,* and *United States v. Andreas, supra;* in *Watkins,* the Court specifically noted that examination of reports made to the Alcohol Tax Unit would not seek to contradict the well pleaded material allegations of the complaint, and in *Andreas,* the Court stated (374 F.Supp. at p. 406):

> " . . . By their affidavit in the instant case, however, defendants would seek to contradict the allegations of the Information by attempting to prove that the contributions, if any, took place prior to October 19, 1968. . . ."

We then move on to the allegations of this Motion.

## II. THE DUE PROCESS ARGUMENT.

The Defendants urge that penalties pursuant to a regulatory statute or administrative regulation cannot, as a matter of law, be imposed upon them consistent with Due Process as a result of a good faith decision to delay compliance pending judicial review of the validity of the legislation or regulation as sought by them in other Courts and in this Court.

Court records reveal that on January 3, 1975, Gulf filed Petitions for Review against the FEA in both the United States Court of Appeals for the District of Columbia Circuit and the United States Court of Appeals for the Fifth Circuit, which suits were pending throughout the February 1–5, 1975 period covered by this Indictment.[9] On January 13, 1975,[10] the FEA published the "First Entitlements List" for the purchase and sale of entitlements for the month of November 1974, which notice provided that Gulf was required to purchase 775,693 entitlements at a cost of $3,878,465.00.[11]

On February 4, 1975, Gulf initiated a civil suit in this Court (C.A. 75–157) to contest the validity of the Entitlements Program, and the FEA counterclaimed for the amount of the civil penalties.

In support of the Due Process argument, the Defendants cite *Wadley Southern Railway Company v. Georgia,* 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915), and *United States v. Pacific Coast European Conference,* 451 F.2d 712 (9th Cir. 1971). In *Wadley* the validity of an order of the Georgia Railroad Commission issued pursuant to the Georgia regulatory statute was questioned when a penalty suit was brought by the State. The Court affirmed the Georgia Supreme Court's enforcement of the penalty for lack of reasonable promptness in contesting constitutionality, stating (235 U.S. at p. 661, 35 S.Ct. at p. 218, 59 L.Ed. at p. 411):

" . . . [T]he right to a judicial review must be substantial, adequate, and safely available; but that right is merely nominal and illusory if the party to be affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality than to ask for the protection of the law."

In *Pacific Coast,* the Court of Appeals applied this principle, referred to as the "constitutional tolling principle" (451 F.2d at 717) and affirmed the trial court's refusal as a matter of law to impose penalties upon certain regulated companies which had promptly initiated suits to contest the validity of the statute and regulations. The United States brought actions against three shipping conferences for the imposition of statutory penalties of $1,000 per day for the use of certain dual-rate shipping contracts allegedly proscribed by the provisions of the 1961 Amendment to the Shipping Act (46 U.S.C. § 813a) and Orders issued by the Federal Maritime Commission pursuant to that Act. The 1961 Act required that by the end of a specified grace period, all dual-rate shipping contracts meet provisions of the Act along with such other provisions as were required by the Federal Maritime Commission. After issuance of the Commission's Orders on March 27, 1964, effective April 4, 1964, the three defendant shipping conferences continued to utilize their pre-existing contracts in violation of both the Act and the Order, and did not apply to the Commission for a stay pending judicial review, but commenced instead judicial proceedings to contest both the validity of the Act and the Commission's Orders by filing petitions for review with the Ninth Circuit Court of Appeals pursuant to the Review Act of 1950, as amended in 1958, 5 U.S.C. §§ 1031–1042 (1958). On February 3, 1965, the Ninth Circuit found the Orders valid and rejected the shipping conferences arguments.[12]

---

9. Later dismissed by stipulation.

10. 40 Fed.Reg. 2560.

11. The final rule for allocation of "Old Oil" was issued on November 29, 1974 and published on December 4, 1974. 39 Fed.Reg. 42246. The Entitlement Price Notice was issued on December 9, 1974 and was published on December 10, 1974. 39 Fed.Reg. 43103.

12. *Pacific Coast European Conference v. United States,* 350 F.2d 197 (9th Cir.), *cert. denied* 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). In this case, the Court rejected defendants' attacks on the validity of the 1961 Act, but did vacate the Commission Orders of March 27, 1964 because of the Commission's procedures utilized in arriving at the Orders.

The three conferences came into compliance on September 14, 1964, December 27, 1965, and January 1, 1967. Thereafter, on April 4, 1967, the United States commenced the statutory penalty cases against the shipping conferences for use of the dual-rate contracts both before and during defendants' litigation contesting the regulatory statute and administrative orders involved. The defendant conferences moved for summary judgment arguing that " ' . . . statutory penalties cannot lawfully attach during the period of a bona fide judicial review of a legislative act, whether statute or administrative agency ruling' ". 451 F.2d at 715–716. The District Court granted summary judgment on the "constitutional tolling principle" and was affirmed by the Ninth Circuit, which held (at p. 717–718):

> "In the light of the setting we have described we conclude that the constitutional tolling principle urged by defendants was correctly applied by the district court in granting summary judgment for defendants. Defendants ought not to have to pay a statutory penalty for non-compliance with the 1961 Act during the time they were judicially testing the validity of that Act, and enjoying the benefits of any additional agency procedures secured to them in that litigation." [13]

To all of this, the Government replies that a motion to dismiss an indictment is not a device for the summary trial of the evidence, but such motion must be directed solely to the question of the validity of the indictment on its face. *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Winer,* 323 F.Supp. 604 (E.D.Pa.1971). The Government urges that an indictment is sufficient if it (1) alleges all the elements of the offense, (2) fairly informs the defendant of that which he must be prepared to meet in preparation of the defense, (3) gives protection

against double jeopardy, and (4) enables the court to determine whether the facts alleged are sufficient in law to withstand the motion to dismiss or to support a conviction. Citing *United States v. Fargas, supra; United States v. Luros,* 243 F.Supp. 160 (N.D.Iowa), *cert. denied* 382 U.S. 956, 86 S.Ct. 433, 15 L.Ed.2d 361 (1965).

We believe, however, that the position of the Government construes too narrowly the purpose of a Rule 12(b) motion. While Rule 12(b) does not provide for speaking motions which could be turned into the trial of the general issue [1 Wright, *Federal Practice and Procedure: Criminal* § 194 at pp. 412–413 (1969)] it would not prevent this Court from determining the applicability of the constitutional tolling principle within the framework of the record in this case. There is in our Indictment, and certainly part of the general issue, the charge that the Defendants *willfully* acted, and this has been held to be an evidentiary matter incapable of resolution by a motion to dismiss. In *United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), the defendant was prosecuted for violation of a law regarding wagering activities and asserted that criminal sanctions for failure to file a special Internal Revenue form, coupled with the danger of incrimination if he filed truthfully, produced a constitutionally infirm coercion. The Court, however, responded (396 U.S. at 83, 90 S.Ct. at 367, 24 L.Ed.2d at 281):

> ". . . [T]he question whether predicament contains the Knox's seeds of a 'duress' defense, or perhaps whether his false statement was not made 'willfully' as required by § 1001, is one that must be determined initially at his trial."

The Court went on to admonish that Rule 12(b)(1) of the Federal Rules Of Criminal Procedure, "indicates that evidentiary questions of this type should

---

**13.** The Court cited *Wadley, supra; Oklahoma Operating Co. v. Love,* 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920); *Missouri Pacific Railway Company v. Nebraska,* 217 U.S. 196, 30 S.Ct. 461, 54 L.Ed. 727 (1910); and *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

not be determined on such a [pretrial] motion."

Our Circuit, as previously noted, held that the Trial Court properly granted the Government's motion to strike affidavits and other exhibits alleging no obscenity, in *United States v. Ginzburg, supra.* And in *United States v. Whalen,* 337 F.Supp. 1012 (S.D.N.Y.1972), there was a charge of violating the National Firearms Act and a motion to dismiss based on the allegation that the weapons in question were "unserviceable". The Court held that there was an evidentiary issue which could not be tried on a motion to dismiss and stressed that the "unserviceable" argument improperly presupposed the insufficiency of the Government's evidence, and that upon the motion to dismiss the facts in the indictment had to be accepted as true. We, therefore, hold that the Due Process argument of the Defendants on the instant Motion to Dismiss must await the outcome of the trial of the general issue.[14]

## III. APPLICABILITY OF THE STAY ORDER OF THE TEMPORARY EMERGENCY COURT OF APPEALS.

Throughout the February 1–5, 1975 period of alleged violations set forth in the instant Indictment, enforcement of the FEA Entitlements Program was stayed in a limited way by reason of an Order entered January 31, 1975 by Judge Tamm of the Temporary Emergency Court of Appeals (TECA).

In the United States District Court for the Western District of Ohio, Marathon Oil Company unsuccessfully sought a preliminary injunction against the enforcement of the Mandatory Petroleum Allocation Regulation. Marathon appealed to TECA and filed a motion for stay of enforcement pending appeal.

Acting upon the motion, Judge Tamm entered an Order on January 31, 1975, which stated in pertinent part as follows:

"IT IS ORDERED that the Federal Energy Administration is enjoined from enforcing the regulations at issue herein *against the Appellant,* pending further order of the court. Appellant shall submit by 12:00 noon February 5, 1975, a memorandum addressing the injunctive relief sought. Appellee shall submit a response by close of business February 7, 1975." [Emphasis supplied]

The Order precludes the enforcement of the regulations against Marathon alone. In fact, TECA lacks statutory jurisdiction to grant any broader relief. Incorporated into the Emergency Petroleum Allocation Act, *see* 15 U.S.C. § 754(a), Section 211(d)(2) of the Economic Stabilization Act of 1970 permits the District Courts and TECA to enjoin temporarily and permanently the application of a particular regulation or order issued under that Title, only to "a person who is a party to litigation before it." The Legislative History of the 1971 Amendments to the Economic Stabilization Act confirms the Congressional intent that general enforcement of the program would continue with respect to all persons other than the party litigants to obtain an interlocutory injunction.[15]

The Defendants here strongly urge that the effect of Judge Tamm's Stay Order and TECA's refusal to dissolve that Order was to preclude at least criminal prosecution for "violations" of the Entitlements Program during the period in which its enforcement was stayed by the only Appellate Court having jurisdiction over the matter. The statute, however, limited the power of the Court to grant any broader injunction, and the Court could not and did not include any

---

14. Although not discussed separately, we also hold that the question of whether Defendants acted with reasonable promptness is in the circumstances of this case, a matter for the trial of the general issue.

15. *See* S.Rep. No. 92–507 (92d Cong., 1st Sess.), 1971 U.S.Code Cong. & Admin.News, p. 2292.

protection for the Defendants in this proceeding. This argument presented by the defense must be rejected.

## IV. CRIMINAL PENALTIES SHOULD NOT BE PERMITTED BECAUSE OF AFFIRMATIVE ASSURANCES THAT SUCH PENALTIES WOULD NOT BE SOUGHT IF SUIT WAS PROMPTLY FILED ATTACKING THE ENTITLEMENTS PROGRAM.

█ The Defendants here argue that they were misled by and relied upon representations of the General Counsel for the FEA, as set forth in their Affidavit, that he would refrain from initiating any other legal proceedings based upon Gulf's delaying the purchase of entitlements pending the outcome of the litigation of Gulf's civil suit. The Government by its Affidavit disputes that of the Defendants.

There are a series of decisions [e. g., *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) (Regulations of the Corps of Engineers); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487, *reh. denied* 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 814 (1965) (Permission to hold a demonstration granted by the Chief of Police in the presence of the Mayor and Sheriff); and *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) (Refusing to answer questions of a State investigating commission when witnesses relied upon assurances by the commission that they could assert such privilege)] holding that matters of reliance are a defense to criminal charges. However, this defense goes to the allegation of willfulness and must be tried under the general issue.

█ As used in the Economic Stabilization Act, 12 U.S.C. § 1904, note, the word willfully connotes "purposely done by one ' "who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements" ' ". *United States v. Futura, Inc.*, 339 F.Supp. 162, 168 (N.D.Fla. 1972). As Judge Middlebrooks noted in

*Futura*, § 208(a) criminal penalties were written with an eye to scienter. The Government's contention is that willful refusal to comply with the Entitlements Program constitutes a crime *malum prohibitum* and not a crime *malum in se*, which would eliminate the requirement of evil purpose or criminal intent. *See Riss & Company v. United States*, 262 F.2d 245 (8th Cir. 1958).

We view the crime charged here as akin to the charge of a willful attempt to evade the payment of income taxes, where the intent is to cheat the government. *See Spies v. United States*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943). The crime here charged is not one in which the government's interest is to protect public safety, *e. g., United States v. E. Brooke Matlack, Inc.*, 149 F.Supp. 814 (D.Md.1957), but to pursue intentionally a course of conduct which will have as an end result the defeat of the national policy of providing for sufficient supplies of petroleum products and maintaining competition in the area. The Congress in enacting § 208(a) of the Economic Stabilization Act, intended that those refiners who, with bad motive or criminal intent, refused to comply with the regulations passed pursuant to the Act, would thereby be subjected to criminal fines. Since criminal intent is a matter of the general issue, Defendants' argument to dismiss must not avail on this ground.

█ Gulf also argues it relied on advice of counsel and that as a matter of law such reliance negates the element of willfulness. As was stated in *United States v. Wood*, 446 F.2d 505 (9th Cir. 1971), the defense of advice of counsel is available when the crime charged is one requiring specific intent as an element thereof. *See Williamson v. United States*, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 (1908); *United States v. Phillips*, 217 F.2d 435 (7th Cir. 1954); *Cf. United States v. Pollmann*, 364 F.Supp. 995 (D.Mont.1973). The crime charged in the instant Indictment is one requiring specific intent, *see United States v. Futura, Inc., supra*, and must await trial on the general issue.

**464**

## V. GULF WAS NOT IN VIOLATION.

■ Defendants also attack this Indictment along the following lines: It is clear that the "Allocation of Old Oil; Entitlement Notice", issued by FEA General Counsel Robert Montgomery on January 10, 1975,[16] established January 31, 1975 as a deadline for *voluntary* compliance with 10 C.F.R. § 211.67(b) for the month of November, 1974. They point to the language of the Notice:

". . . For refiners and eligible firms that have failed to consummate entitlement transactions on or prior to January 31, 1975, FEA *may* direct sales and purchases of entitlements pursuant to the provisions of 10 C.F.R. 211.67(j)." [Emphasis supplied]

They also refer the Court to 10 C.F.R. § 211.67(j) which uses the same elective (as opposed to mandatory) words, "The FEA *may* direct . . .". Defendants then go on to say that the two statements read in conjunction clearly indicate that a *willful* violation could not occur until after January 31, 1975, and then only after the FEA had directed purchases pursuant to 10 C.F.R. § 211.-67(j).

Defendants further argue that the Remedial Order of January 29, 1975, issued two days before the final date for voluntary compliance, was of no effect since such an order is contemplated only in response to a refiner's filing of a compliance report on the 10th of the month, indicating that the refiner had not complied voluntarily with the regulations. They conclude that they could not be in violation of any FEA Order until they failed to comply with such an order filed at least after January 31st and, in the case of a willful violation, after the filing of the refiner's report and the subsequent issuance of a remedial order.

On January 10, 1975, FEA issued the Entitlement Notice for the month of November, 1974, with entitlement transactions to be completed on or before January 31, 1975. That Notice provided in pertinent part (40 Fed.Reg. 2560):

"Entitlement purchases required under 10 CFR 211.67(b) for the month of November must be effected by January 31, 1975. On or prior to February 10, 1975, each refiner and eligible firm which has been issued entitlements for November shall file with FEA the monthly transaction report specified in 10 CFR 211.66(i) certifying its purchases and sales of entitlements for the month of November. FEA will mail monthly transaction report forms for November 1974 to reporting firms in January 1975. Refiners and eligible firms which have been unable to locate firms for required entitlement transactions by January 25, 1975 may contact FEA at 202–634–7610 to obtain assistance in locating a firm with outstanding purchase or sale requirements. For refiners and eligible firms that have failed to consummate entitlement transactions on or prior to January 31, 1975, FEA may direct sales and purchases of entitlements pursuant to the provisions of 10 CFR 211.67(j)."

It is important to note that refiners unable to locate firms with which to complete entitlement transactions are given the opportunity of contacting the FEA in order that *all* firms may complete transactions by January 31, 1975. Section 211.67(j) of 10 C.F.R. provides the second step in the entitlement ladder: If any firm has not purchased entitlements as provided in 211.67(b), the FEA may direct such purchases.

It is further provided that by the 10th day of each month, all refiners are to report or certify its sales and purchases of entitlements for the third month prior to the month in which the report is filed. *See* 10 C.F.R. § 211.66(i).

Subpart O of Part 205, 10 C.F.R., sets forth the procedure to be followed in cases of violations or probable violations of FEA Regulations.

Section 205.190(b) states that when any report required by the FEA or any

---

**16.** See Note 8, *supra.*

investigation of the FEA discloses a violation, or a possible violation, of the regulations or any order issued thereunder, the FEA is entitled to conduct proceedings to determine its nature and extent. It is further provided that the FEA may commence said proceedings by serving a notice of probable violation or by issuing a remedial order for immediate compliance.

Section 205.191 provides for the procedure to be followed in the event that an investigation is commenced with the issuance of a notice of probable violation.

Section 205.192 states that when the FEA establishes [17] that a violation has occurred, is occurring, or is about to occur, it may issue a remedial order setting forth the factual and legal basis of the order. That order is deemed to be effective upon issuance in accordance with its terms, until stayed, suspended, modified, or rescinded.

Section 205.193 is the exception to the general rules set forth in 205.191 and 205.192, and states that when:

"(1) There is a strong probability that a violation has occurred, is continuing, or is about to occur;

(2) Irreparable harm will occur unless the violation is remedied immediately; and

(3) The public interest requires the avoidance of such irreparable harm through immediate compliance and waiver of the procedures afforded under §§ 205.191 and 205.192";

the FEA may issue a remedial order for immediate compliance, effective upon issuance. This order, as in the case of any remedial order, shall set forth the factual and legal basis upon which the said order is made and shall, in addition, set forth the special findings detailed in (1), (2), and (3) above.

It is finally provided in Section 205.-195(b) that any person against whom a remedial order as described above is issued, may appeal the order with the FEA Office of Exceptions and Appeals, or with the appropriate regional office, within ten days of service of the order.

Counsel for the Defendants would have this Court interpret the regulations to mean that no FEA action could be taken before January 31, 1975; that after that date, the FEA could still not assert a willful refusal to comply with the regulations until the refiner had submitted a compliance report by the 10th of February indicating failure to voluntarily comply, followed by the FEA's issuance of a remedial order directing compliance.

Defendants' interpretation of the regulations fails to take 10 C.F.R. § 205.193 into account; the provision specifically utilized by the FEA in this case.[18] See Complaint at C.A. No. 75–157, Exhibit E, p. 7. The Order issued January 29, 1975, specifically stated, *"This Order shall be effective immediately."* This Court concludes that Defendants could not reasonably construe the FEA regulations to read that willful non-compliance would not occur until they failed to comply with a post-January 31, 1975 remedial order. Section 205.193 clearly supercedes the normal procedures to be followed in cases of violations, " . . . about to occur . . . ", and allows for orders directing immediate compliance in those cases. On this issue, the Defendants' argument has no merit.[19]

---

**17.** A suspected violator is first given ten days to reply. 10 C.F.R. § 205.191(b).

**18.** *See also,* 10 C.F.R. § 205.201 which provides that any practice which " . . . contravenes or results in a circumvention or contravention of the requirements of any provision of this chapter *or any* order issued pursuant thereto is a violation of the FEA regulations stated in this chapter." [Emphasis supplied]

**19.** Notwithstanding the January 29th Order upon which authority FEA relies, this Court reads the regulations as not requiring a remedial order *at all* before the sanctions of, 10 C.F.R. § 205.202 would apply.

Section 211.67(b) states *inter alia* that entitlement purchases "shall be effected by the close of the second month following that month." On January 10, 1975, the FEA, in accordance with the directives of § 211.67(i) published its entitlement issuances and in con-

## VI. THE GOVERNMENT IS PRE-CLUDED FROM SEEKING CRIMINAL PENALTIES.

■ Defendants' contention here is that the Government, having elected to counterclaim for a civil penalty in C.A. No. 75–157 for violations of the FEA regulations, pursuant to Section 208(b) of the Economic Stabilization Act, may not now seek to impose the criminal penalties provided in Section 208(a). They assert that Section 208, the penalty section of the Emergency Petroleum Allocation Act, does not indicate a Congressional intent to make the civil *and* criminal penalty provisions cumulative, and in the absence of such intent, the Court must construe the penalties as alternative. *United States v. Clements,* 471 F.2d 1253 (9th Cir. 1972). In support of their position, Defendants refer the Court to portions of the Legislative History of the 1971 Amendments to the Economic Stabilization Act, wherein it is stated [S.Rep. No. 92–507 (92d Cong., 1st Sess.), 1971 U.S.Code Cong. & Admin. News, at p. 2291]:

> "A civil penalty of $2,500 for each violation may be imposed by a court. The power to impose a civil penalty gives a flexibility to the court by avoiding the sole alternatives of criminal sanction or nothing."

The Defendants also allege that a construction permitting the imposition of both civil and criminal sanctions for the same act would be one which would raise "serious doubts" as to the constitutionality of the provision in that such action would violate the Double Jeopardy Clause of the Constitution.

The Government in opposition claims that the civil and criminal penalties "are not imposed for identical offenses although the same act may be involved." Nothing in the Act indicates that the Government must elect one penalty or the other; the penalty provision is not drafted in the disjunctive. The Government points to another part of the Legislative History (S.Rep. No. 92–507, *supra,* 1971 U.S.Code Cong. & Admin.News at pp. 2290–2291):

> " . . . There are two sanctions that may be imposed upon violators of any regulation or order issued under the authority of this committee bill. . . ."

This change in the Economic Stabilization Act,[20] they claim, gives clear indication that Congress intended the penalties for violations of the Emergency Petroleum Allocation Act to be cumulative. The Government also points out the applicable portion of the FEA's regulations, 10 C.F.R. § 205.202(a)(1), wherein it is stated that the criminal and civil penalty provisions "shall be deemed cumulative and not mutually exclusive." Finally, the Government states that the Double Jeopardy Clause of the Constitution does not apply to instances wherein the penalties imposed for the same act are both civil and criminal.

Both parties agree that in considering whether these two penalties may be im-

---

nection therewith again stated, "Entitlement purchases required under 10 C.F.R. 211.67(b) for the month of November *must* be effected by January 31, 1975." [Emphasis supplied] However, this merely restated the mandate of § 211.67(b). Thus, violation of the FEA directive of January 10th and § 211.67(b) would occur whether or not a remedial order was issued. As the Government properly points out:

> "Under the above regulatory scheme, the only prerequisites to the imposition of criminal sanctions are findings that a violation of the regulations occurred and that such was done willfully. The regulatory scheme clearly imposes no requirement either that a remedial order must issue or that a period for reporting lapse. Indeed, if anything, the

contrary is set forth in the regulations, since a violation of the regulations and circumvention of a remedial order are set forth in the disjunctive in Sections 205.201 and 205.202, as alternative and independent bases for finding a violation, willful or non-willful.

> Thus, the violation is properly found in the breach of duty to comply with the regulations and Entitlements Notice to purchase Entitlements by January 31, 1975, regardless of whether a remedial order had issued and regardless of when reporting was required." (Govt. Brief pp. 32–33).

20. The 1970 Act provided: "Whoever willfully violates any order or regulation under this title shall be fined not more than $5,000."

posed for the same act, the intent of Congress must serve as our benchmark; indeed, as it was stated in *United States v. Clements, supra,* at p. 1254:

" . . . Unless we can find from the face of the Act or from its legislative history a clear indication that Congress intended to authorize multiple punishments for a single transaction, we are obliged to construe the Act against the harsher penalties that result from cumulative punishments. . . . "

The applicable portion of the 1971 Amendments to the Economic Stabilization Act, which was passed in lieu of the House Bill, provides:

"SANCTIONS

Section 208 of the Economic Stabilization Act, as amended by this bill, relates to sanctions. There are two sanctions that may be imposed upon violators of any regulation or order issued under the authority of this committee bill. The existing criminal fine has been clarified to make it understood that the $5,000 fine is for each violation.

A civil penalty of $2,500 for each violation may be imposed by a court. The power to impose a civil penalty gives a flexibility to the court by avoiding the sole alternatives of criminal sanction or nothing."

This Court is of the opinion that the report provision noted above does not *clearly* spell out that the penalty is cumulative. However, the intent of Congress is more clearly revealed in the "Section-by-Section Analysis" of the Bill, reported at 1971 U.S.Code Cong. & Admin.News, at p. 2298:

"Section 208. Provides for a $5,000 criminal fine for each violation *and a* $2,500 penalty for each violation." [Emphasis supplied]

This portion of the Section-by-Section Analysis gives support to what we believe the Congress intended.[21] As this Court reads the Legislative History, the penalties contemplated were not to be alternatives. The second sentence of the report portion on sanctions states that there are two sanctions available. Congress did not, as it could easily have done, stated that there "are two alternative sanctions"; instead, it merely stated that two sanctions may be imposed. This interpretation is only reinforced by the Section-by-Section Analysis, which clearly used the conjunctive rather than the disjunctive.

In *United States v. Finley Coal Company,* 345 F.Supp. 62 (E.D.Ky.1972), *aff'd and cause remanded* 493 F.2d 285 (6th Cir.), *cert. denied* 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681 (1974), defendants in a criminal proceeding arising under the Federal Coal Mine Health and Safety Act of 1969 raised the same contention, that in view of the fact that civil penalty proceedings had been previously instituted, criminal actions were not appropriate. The Court, ruling in favor of the Government, stated (at p. 63):

" . . . Another ground—violation of the intent of Congress in passing the legislation and the purpose announced in Section 109 [the penalty provision] of Act by the criminal and civil actions—is raised. No merit is found in [this] argument in view of the clear intent of the Congress to impose both civil and criminal sanctions to implement its findings and declaration of purpose, 30 U.S.C. § 801."

The findings and declaration of purpose as noted in § 801, emphasize that the Coal Mine Health and Safety Act of 1969 was adopted to protect life.[22] Significantly, the House Report noted that access to coal, our most abundant natu-

---

21. *See also* H.R.Rep. No. 93–531 (93d Cong., 1st Sess.), 1973, U.S.Code Cong. & Admin. News, at p. 2583, wherein it is stated in the "Brief Summary" of the EPAA Legislative History: House Report, "Violations of the President's regulation or orders issued under authority in this bill would be punishable by criminal *and* civil penalties. . . . " [Emphasis supplied]

22. Relevant portions of the Legislative History, excerpted from the 1969 U.S.Code Cong. & Admin.News, are attached as Appendix A.

ral resource, would inevitably be limited without passage of the Act. The History of the Emergency Petroleum Allocation Act [23] indicates a legislative concern for the same crisis-type situation. Here, the House Report noted in its "Section-By-Section Explanation" that petroleum shortages,

" . . . have created or will create severe economic dislocations and hardships, and that such hardships and dislocations jeopardize the normal flow of commerce *and constitute a national energy crisis which* is a threat to the public health, safety, and welfare . . . ". [Emphasis supplied]

We believe that the Congressional expression of immediate concern with a situation demanding immediate remedy is evidence in both histories. We agree with the *Finley* Court's belief that such a history indicates that Congress expressed "the clear intent . . . to impose both civil and criminal sanctions to implement its findings and declaration of purpose.[24]

As to Defendants' double jeopardy contention, we need only note that "it is settled that the Congress may constitutionally impose both a civil and a criminal sanction in the same Act for the same offense." *United States v. Finley Coal Company, supra,* at p. 64, and cases cited therein. The Defendants' argument is without merit.

## VII. THE FEA REGULATIONS ARE UNCONSTITUTIONAL.

■ Defendants also contend that the Entitlements Program as established by Regulation is arbitrary and capricious; unauthorized and contrary to law; and violates the Fifth Amendment to the Constitution.

This Court has heretofore ruled that the Program is neither arbitrary and capricious, nor contrary to law, *Gulf Oil Corporation v. Federal Energy Admin.,* 391 F.Supp.. 856 (W.D.Pa.1975), *appeal dismissed* 521 F.2d 810 (Em.App. 1975). *See also, Marathon Oil Company v. Federal Energy Administration,* Civ.No. 75–36 (N.D.Ohio, filed January 31, 1975), *appeal dismissed* 516 F.2d 1397 (Em.App. 1975); *Exxon Oil Company v. Federal Energy Administration,* Civ.No. 75–150 (D.N.J., filed January 30, 1975), *appeal dismissed* 516 F.2d 1397 (Em.App. 1975); *Cities Service Company v. Federal Energy Administration,* Civ.No. 75–653 (D.D.C., filed July 10, 1975), *affirmed* No. DC–34 (Em.App.).[25]

We only note the comments of the Court in *Cities Service, supra,* (Sl.Op., pp. 15–16):

" . . . The program effectuates the important public purposes set forth in Section 4(b)(1) of the Allocation Act through a fair and equitable regulatory scheme (*Condor Operating Co. [v. Sawhill], supra,* [514 F.2d 351 (TECA 1975), *cert. denied* 43 U.S.L.W. 3614 (1975)]); does not result in a direct appropriation of property by the Government ('Legal Tender Cases'; *Knox v. Lee,* 12 Wall. (79 U.S.) 457 [20 L.Ed. 287] (1870)); and at its worst, causes a restriction on profits which is not unlawful since such a restriction results from a valid regulatory scheme. (*Western States Meat Packers Ass'n v. Dunlop,* 482 F.2d 1401 (T.E.C.A.1973) and *Local Union No. 11 v. Boldt,* 481 F.2d 1392 (T.E.C.A.), *cert. denied,* 414 U.S. 1092 [94 S.Ct. 735, 38 L.Ed.2d 549] (1973). Moreover, as a valid regulatory scheme, the cost equalization program does not violate the Fifth Amendment even though it may

---

**23.** Relevant portions of the Legislative History, excerpted from the 1973 U.S.Code Cong. & Admin.News, are attached as Appendix B.

**24.** We need not consider the Government's contention that the regulations, 10 C.F.R. § 205.202(a)(1), indicating that the penalties are mutually exclusive, is entitled to weight, is

without merit. *See Campbell v. Galeno Chemical Co.,* 281 U.S. 599, 50 S.Ct. 412, 74 L.Ed. 1063 (1930).

**25.** *Cities Service* was affirmed by the Temporary Emergency Court of Appeals on December 31, 1975, 529 F.2d 1016.

deny the owner of the most profitable use of its property [citations omitted]." This contention has heretofore been thoroughly evaluated not only by this Court but by at least three other District Courts. The Temporary Court of Appeals, has, albeit in another context, approved the Cost Equalization Program. *Pasco, Inc. v. Federal Energy Administration and Frank G. Zarb,* 525 F.2d 1391 (Em.App., filed October 14, 1975). We find no persuasive reasons for reversing our original view, and must therefore deny the Motion insofar as it relates to this contention.[26]

### VIII. THE MOTION OF GULF OIL COMPANY–U.S.

■ Defendant Gulf Oil Company-U.S. contends that the Indictment must be dismissed as to it for the reason that this Defendant has no separate corporate existence, but is a division of the Gulf Oil Corporation. Admittedly, Gulf Oil Company-U.S. was created pursuant to a resolution of the Gulf Oil Corporation's Board of Directors, which read in pertinent part as follows:

"RESOLVED, That the United States operations of this Corporation be, and they are hereby designated to be, operated as a separate division of the Corporation known as 'Gulf Oil Company-U.S.' and that the legal status of said Company and its identity with Gulf Oil Corporation be appropriately shown, where necessary or advisable, by adding after its name the following 'a Division of Gulf Oil Corporation'; and

RESOLVED FURTHER, That the business, operations and affairs of said Gulf Oil Company-U.S. shall be the business, operations and affairs of Gulf Oil Corporation within the United States; . . .".

It is then contended that Gulf Oil Company-U.S. is incapable of performing any legally cognizable acts independent of the corporate entity. *E. g., Carbide and Carbon Chemicals Co. v. Northwest Exterminating Co.,* 207 Misc. 548, 139 N.Y. S.2d 480 (1955).

The Government in opposition contends that Section 208 of the Economic Stabilization Act clearly states that *"whoever"* violates any regulation or order . . . is subject to criminal and civil penalties, and refers us to 1 U.S.C. § 1 which provides that the word "whoever" is generally defined to include "corporations, *companies,* associations, firms, partnerships, societies, and joint stock companies, . . . ." [Emphasis supplied] They also note that FEA regulations, 10 C.F.R. § 205.2, include "companies" in their definition of the word "person". They further assert that Gulf-U.S. held itself out as a separate entity, pointing to the fact that Gulf-U.S. has its own officers who "have such authority and duties as are generally possessed and exercised by executives having like titles and corresponding positions in business corporations generally"; that these officers are "authorized and empowered [to act] for and on behalf of Gulf Oil Corporation"; and that such holding out is evidenced *e. g.* by Gulf-U. S.'s letter of January 28, 1975 from the Defendant Bonner to FEA Administrator Zarb. The Government submits that the final determination of Gulf-U.S.'s legal status can be reached only after a full evaluation of the pertinent facts. It therefore contends that this Court postpone its consideration of this issue until the trial of the general issue.

Our prior evaluation of the legal authority on Rule 12(b) motions leads us to conclude that we are not here presented with a disputed fact question which must await the trial; rather, we are confronted with a legal issue. The resolution of this issue depends not at all on the proof of facts; the pertinent portion

---

**26.** We find noteworthy Defendants' contention that the Congressional History indicates the Emergency Petroleum Allocation Act was intended to permit the allocation by the executive branch of oil to account for "geographic petroleum shortages". This argument fails to account for the specific treatment in H.R.Rep. No. 93–531, of the energy shortage as it affected competition. See 1973 U.S.Code Cong. & Admin.News, p. 2586.

470

of the Luton Affidavit, *viz.*, that Gulf-U.S. has no separate existence, does not seek to vary the material allegations of the Indictment. *See United States v. Koontz Creamery, Inc., supra; United States v. Miller*, 491 F.2d 638 (5th Cir.), *cert. denied* 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186 (1974).

Our research and that of counsel have failed to disclose any cases applying a criminal statute such as this to a corporation *and* its operating division, although denominated a "company".

The Government points to *United States v. A & P Trucking Company*, 358 U.S. 121, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958), which allowed indictments of partnerships under statutes calling for penalties against "whoever" knowingly violated certain I.C.C. regulations, when a strong Congressional intent to insure compliance was found, regardless of the form of organization and whether the alleged violator be a corporation, a joint stock company, a partnership, or an individual proprietorship. But this case is inapposite to the situation here presented, where the compliance can be enforced against the corporation. We do not here state that Congress could not impose criminal liability upon this form of business entity. *Cf. New York Central & Hudson R.R. Co. v. United States*, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1909) with *United States v. Illinois Central R. Co.*, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938) and *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004 (9th Cir. 1972), *cert. denied* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973).

Bearing in mind the admonition of Chief Justice Marshall in *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820) that criminal laws are strictly construed " . . . on the plain principle that the power of punishment is vested in the legislative, not in the judicial department," we hold that this penal statute cannot be applied to an entity which is an operating division of a corporation. The Motion of Gulf Oil Company-U.S. to Dismiss will be granted.

## IX. MOTION OF Z. D. BONNER TO DISMISS.

■ The Indictment here charges Z. D. Bonner, "individually and in his capacities as president of Gulf Oil Company-U.S. and as executive vice president and director of Gulf Oil Corporation", with willfull violations of Section 211.-67(b) of the Mandatory Petroleum Allocation Regulations, which reads:

"(b) *Required purchases of entitlements by refiners.* For each month, commencing with the month of November 1974, each refiner that has been issued fewer entitlements for that month than the number of barrels of old oil included in its adjusted crude oil receipts shall purchase a number of entitlements effective for that month equal to the difference between the number of barrels of old oil included in that refiner's adjusted crude oil receipts for that month and the number of entitlements issued to and retained by that refiner. Entitlement purchases required under this paragraph (b) with respect to a particular month shall be effected by the close of the second month following that month."

10 C.F.R. § 211.51 defines "refineries" and "refiners" as follows:

\* \* \* \* \* \*

" 'Refineries' means those industrial plants, regardless of capacity, processing crude oil feedstock, and manufacturing refined petroleum products, except when such plant is a petrochemical plant.

'Refiners' means those firms that own, operate or control the operation of one or more refineries. . . . "

Mr. Bonner then argues that since he does not "own, operate, or control the operation of one or more refineries", and at most is merely the agent of a corporation which does so, that the regulation which he is alleged to have violated is not broad enough in scope to include the agents of refiners, but is limited by its own language to refiners.

The Government to the contrary points to the well recognized principle that corporate officers who participate in violations of law may be held criminally liable for their actions, citing *United States v. Wise*, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and the affirmation of *Dotterweich* in *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). This latter case is most instructive for in that case the Acme Markets, Inc., the national retail food chain, had plead guilty to violations of the Federal Food, Drug and Cosmetic Act relating to receipt of food shipped in interstate commerce and warehousing the same in buildings accessible to rodents and to contamination by rodents. The evidence at the trial indicated that the Food and Drug Administration (FDA) advised Park, chief executive officer of Acme, of unsanitary conditions in Acme's Philadelphia warehouse, and in 1971 the FDA found similar conditions existing in the Baltimore warehouse and in a second inspection of that warehouse again found unsanitary conditions in 1972. The Supreme Court in an opinion by Mr. Chief Justice Burger approved instructions which stated as follows (421 U.S. at p. 665, 95 S.Ct. at p. 1908, 44 L.Ed.2d at p. 497, n. 9):

" 'In order to find the Defendant guilty on any count of the Information, you must find beyond a reasonable doubt on each count . . . .

. . . . .

'Thirdly, that John R. Park held a position of authority in the operation of the business of Acme Markets, Incorporated.

'However, you need not concern yourselves with the first two elements of the case. The main issue for your determination is only with the third element, whether the Defendant held a position of authority and responsibility in the business of Acme Markets.

. . . . .

'The statute makes individuals, as well as corporations, liable for violations. An individual is liable if it is clear, beyond a reasonable doubt, that the elements of the adulteration of the food as to travel in interstate commerce are present. As I have instructed you in this case, they are, and that the individual had a responsible relation to the situation, even though he may not have participated personally.

'The individual is or could be liable under the statute, even if he did not consciously do wrong. However, the fact that the Defendant is pres[id]ent and is a chief executive officer of the Acme Markets does not require a finding of guilt. Though, he need not have personally participated in the situation, he must have had a responsible relationship to the issue. The issue is, in this case, whether the Defendant, John R. Park, by virtue of his position in the company, had a position of authority and responsibility in the situation out of which these charges arose.' "

The Court in discussing *Dotterweich*, stated (421 U.S. at p. 668, 95 S.Ct. at p. 1910, 44 L.Ed.2d at p. 499):

"Central to the Court's conclusion that individuals other than proprietors are subject to the criminal provisions of the Act was the reality that 'the only way in which a corporation can act is through the individuals who act on its behalf.' 320 US at 281, 88 LEd 48, 64 SCt 134. The Court also noted that corporate officers had been subject to criminal liability under the Federal Food and Drugs Act of 1906, and it observed that a contrary result under the 1938 legislation would be incompatible with the expressed intent of Congress to 'enlarge and stiffen the penal net' and to discourage a view of the Act's criminal penalties as a ' "license fee for the conduct of an illegitimate business." ' 320 US at 282–283, 88 LEd 48, 64 SCt 134 (Footnote omitted.)"

And further, consistent with this case law, nothing in the Emergency Petroleum Allocation Act, FEA Regulations, or the Economic Stabilization Act of 1970, suggests that a corporate officer is immune from criminal sanctions for actions performed in connection with the corporation's willful violation of law.

With the above principles in mind, it becomes evident to us that the Motion to Dismiss as to Z. D. Bonner must be denied.

An appropriate Order shall be entered.

## APPENDIX "A"

## HOUSE REPORT NO. 91–563

## FEDERAL COAL MINE HEALTH AND SAFETY ACT

### PURPOSE OF THE BILL

\* \* \*

It is the purpose of the bill H.R. 13950 to protect the health and safety of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families.

\* \* \*

### BACKGROUND

Even after the 1966 amendments, however, the larger number of causes of fatalities and accidents remain beyond the reach of the Federal statute. This broader, non-Federal area of coal mine safety was left by the Congress in 1952 to be embraced by State laws and the Federal Mine Safety Code. By doing so, the Congress intended to attack fatalities by major disaster. The remaining 90 percent of accident occurrences resulting in death or injury were left covered only by State law and the safety code.

The death of 222 miners in 1967, 311 in 1968, the Farmington disaster, and the death of over 170 miners in nondisaster type accidents since Farmington now surrounds the consideration of this legislation.

\* \* \*

### NEED FOR THE LEGISLATION

In September 1968, President Johnson proposed a strong new Federal Coal Mine Health and Safety Act. In March, President Nixon submitted a proposal which was similar to that of his predecessor. In doing so, President Nixon said:

The workers in the coal mining industry and their families have too long endured the constant threat and often sudden reality of disaster, disease, and death. This great industry has strengthened our Nation with raw material of power. But it has also frequently saddened our Nation with news of crippled men, grieving widows, and fatherless children.

Death in the mines can be as sudden as an explosion or a collapse of a roof and ribs, or it comes insidiously from pneumoconiosis or black lung disease. When a miner leaves his home for work, he and his family must live with the unspoken but always present fear that before the working day is over, he may be crushed or burned to death or suffocated. This acceptance of the possibility of death in the mines has become almost as much a part of the job as the tools and the tunnels.

The time has come to replace this fatalism with hope by substituting action for words. Catastrophes in the coal mines are not inevitable. They can be prevented, and they must be prevented.

\* \* \*

Clearly, if we are to have any impact on the day-to-day accidents that cause most of our coal mine injuries and deaths, we need a law that gives broader enforcement powers to the inspector and thereby provides stronger incentives for management and labor to think safety at all times. We must reduce injuries and eliminate the accidents that kill miners by the ones, twos, or threes as well as prevent major disasters.

\* \* \*

There is more at stake here than the lives and health of 144,000 coal miners, though they surely merit our most strenuous efforts on their behalf. The problems that we are wrestling with have an impact that extends beyond any coal mine. If we fail, those problems can weaken the physical and moral fiber of our whole society.

Coal is our most abundant fuel resource. Right now, it supplies nearly a fourth of our total energy demand and every forecast, whether by Government or the private sector, indicates that coal must continue to play a significant role if this country's future energy requirements are to be satisfied.

At the same time, it is clear that our society can no longer tolerate the exorbitant cost in human life and human misery that is exacted in the mining of this essential fuel. Unless we find ways to eliminate that intolerable cost, we must inevitably limit our access to a resource that has an almost inexhaustible potential for industrial, economic, and social good.

The adequacy of a major industry's work force is at stake here. If we cannot today assure coal miners a safe and healthful working environment and educate them in the practices that will keep it safe and healthful, our mines tomorrow will be unable to attract the workers they need, and the industry will sicken for want of qualified manpower.

\* \* \*

When discussing the Code, which is not enforceable by the Bureau, Director O'Leary said:

In this context it is significant to note that while we are able to achieve virtually 100-percent compliance with the mandatory provisions of the Federal Coal Mine Safety Act, compliance during the inspections with the nonenforceable code provisions leaves much to be desired. Although such compli-

ance ranges as high as 90 percent in some of the captive mines of the steel companies, the average is about 65 percent for large coal mines. At the small coal-producing operations, compliance with code provisions was as high as 33 percent in one State, but was as low as 7 percent in another.

For these reasons we are convinced that conditions in our coal mines cannot be significantly improved without new and stronger health and safety legislation. The Bureau needs broader authority, and it needs it now, in order to bring coal mine injury and fatality rates into line with those of other major industries, and to assure that our coal miners do not escape accidental injuries only to fall victim to an insidious occupational disease. \* \* \*

\* \* \* \* \* \*

The committee fully subscribes to the foregoing positions, as evidenced by the product of its intensive and extensive deliberations—H.R. 13950.

For too long the Congress has countenanced the passage of piecemeal measures which have failed to provide the Bureau with the enforcement power it needs. Too many injuries and too many lives have filled the gap left by inadequate laws. A strong law is necessary to protect the men who extract one of our Nation's most vital resources. Coal miners deserve the safest, healthiest work environment our technology will enable us to provide.

\* \* \*

CONFERENCE REPORT NO. 91–761

STATEMENT OF THE MANAGERS ON THE PART OF THE HOUSE

\* \* \*

*Section 2*

The Senate bill and the House amendment each contained statements of findings and purposes which were substantially the same. The committee of conference adopts these provisions with appropriate modifications to recognize the transfer of functions from the Surgeon

General to the Secretary of Health, Education, and Welfare, and to incorporate the more detailed Senate provisions relating to the particular purposes of the act which emphasize the need to eliminate unsafe and unhealthful conditions and practices in this industry. In adopting these provisions, the managers intend that the act be construed liberally when improved health or safety to miners will result.

## APPENDIX "B"

## EMERGENCY PETROLEUM ALLOCATION ACT OF 1973

### HOUSE REPORT NO. 93-531

\* \* \*

### BRIEF SUMMARY

\* \* \*

Violations of the President's regulation or orders issued under authority in this bill would be punishable by criminal and civil penalties. Enforcement may be obtained through court injunctive process. And private actions are permitted to compel adherence to the terms of the President's regulation or orders or to recover damages for violations.

### BASIS FOR THE LEGISLATION

In the course of the 1st session of this Congress, a great many members have addressed the House on the subject of the "energy crisis." Indeed, no other subject (save the condition of the economy) has attracted as much attention and debate nor produced as much concern. There have been charges made that the crises is unreal, unnecessary or has been orchestrated by the major oil companies. To say the least this debate has produced much misinformation and confusion. Your Committee has not attempted to fix blame for the crisis nor to propose a solution to it. Instead its focus has been on the emergency situation confronting this nation. This country now has actual and imminent shortages in crude oil, residual fuel oil and refined petroleum products. And whatever their origins, the Committee finds that these shortages are real, severe, and cannot be dealt with through reliance or a free market structure or voluntary programs. The Committee believes that the basis and need for Federal intervention in the market to order mandatory allocations of certain fuels is well established.

\* \* \*

### CURRENT FUELS SHORTAGE PICTURE

By every measure and statistic echoed in the pages of every study brought to the Committee's attention, we risk significant shortages in this coming winter.

\* \* \*

. . . [t]he Subcommittee concludes that—

Local shortages will crop up unless inventories are optimally distributed about the country and among the sectors of the distribution system, including independent distributors. \* \* \*. In the absence of effective Federal policy, disastrous shortages could strike certain regions of the United States \* \* \* these regions in which shortages tend to concentrate are New England, the Upper Mid-West, and the Mid-Atlantic States (New York, New Jersey and Pennsylvania). The prospects of grave problems in these regions are very high, and it is for this reason that mandatory allocation of fuels is now essential and must not be delayed any longer.

\* \* \*

### INDEPENDENT MARKETERS AND DISTRIBUTORS OF REFINED PRODUCTS

There can be little doubt that the independent sector of the petroleum industry, especially at the marketing level, suffered most as a result of the gasoline shortages of this past summer and few would question that it will be the independent sector that will suffer most

from the shortages predicted for this coming winter. Witnesses in the Committee's hearings testified that over 2,000 independent marketers of gasoline had been forced out of business by July of this year. As the shortage continued throughout the summer, additional numbers of independent distributors and dealers of gasoline were undoubtedly forced out of the market.

\* \* \*

The Committee firmly believes that we should not allow shortages of gasoline—or for that matter shortages of crude oil, residual oil or other refined petroleum products—to cause shortages of competition. The self-regulating laws of supply and demand are not currently operating in the petroleum product market. It is imperative that the Federal government now accept its responsibility to intervene in these markets to preserve competition. Witnesses have testified that if we fail to do so, the cost to the consumer will ultimately be measured in many millions of dollars.

\* \* \*

## SECTION–BY–SECTION EXPLANATION

\* \* \*

*Section 2. Findings and purpose*

Section 2 of the bill states findings and the purpose of the bill. The findings of Congress are that shortages of crude oil, residual fuel oil, and refined petroleum products caused by inadequate domestic production, environmental constraints, and the unavailability of sufficient imports now exist or are imminent; that such shortages have created or will create severe economic dislocations and hardships, and that such hardships and dislocations jeopardize the normal flow of commerce and constitute a national energy crisis which is a threat to the public health, safety, and welfare and can be averted or minimized most efficiently and effectively through prompt action by the Executive branch of Government.

Subsection (b) states the purpose of the bill to be to grant the President, and direct him to exercise, specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system; and directs this authority to be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy.

One of the causes of the shortages in crude oil, residual fuel oil, and refined petroleum products is identified as being "environmental constraints." The adoption and imposition over the past few years of legislation to deal with critical environmental problems has directly and indirectly imposed constraints on the ability of the energy industries to meet growing energy demand. There is today a great deal of pressure to retreat from our environmental standards in order to permit an increase in energy production. In the Committee's opinion a mandatory allocation program such as is called for in this bill gives the best opportunity in the short term for meeting our energy requirements without forcing a retrenchment of our environmental goals.

\* \* \*

## CONFERENCE REPORT 93–628

## JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

\* \* \*

*Conference substitute*

The Senate recedes. By way of initial emphasis it should be noted that the bill which the Conference Committee reports today is not designed to and should not be interpreted as increasing supplies of critically short petroleum products. The shortages problem is the result of policies which have been in effect over a number of years, and it awaits a more far reaching and long ranged solution. Instead, this bill focuses on the short term objectives of seeing to it that during times of shortage our priority needs

are met and that whatever limited supplies we have are equitably distributed throughout the nation to meet regional needs and preserve competition in the marketplace. Although specific language to this end was not included in the bill, it is the clear and firm understanding on the part of the Managers of both Houses that the mandatory allocation program called for in this legislation shall not be designed or implemented in a manner which would have the net effect of occasioning a substantial reduction in the total supply of crude oil, residual fuel oil or refined petroleum products. It is expected that the President in applying the mandatory controls called for in this legislation will assiduously avoid that result.